IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | CRIMINAL INDICTMENT NO.: |
| | : | 2:17-CR-00037-RWS-JCF |
| TERRYL SCOTT SEESE | : | |

## ORDER and REPORT AND RECOMMENDATION

This case is before the Court on Defendant's Motion To Suppress Statement (Doc. 15) and Motion To Suppress Evidence (Doc. 17). For the reasons discussed below, it is **RECOMMENDED** that Defendant's motions be **DENIED**.

## Procedural History

An Indictment filed on December 19, 2017 (Doc. 1) charges Defendant with possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). Defendant moved to suppress any statements he made to law enforcement (Doc. 15), and he also moved to suppress all evidence seized as a result of a warrantless search (Doc. 17). The Court conducted a hearing on Defendant's motions on May 9, 2018 (*see* Doc. 23), and a transcript[1] of that hearing was filed on June 6, 2018 (Doc. 25). Defendant filed a post-hearing brief (Doc. 32), and the Government has responded (Doc. 34). Defendant did not submit a reply. With briefing now complete, the undersigned considers the merits of Defendant's motions.

---

[1] References to that transcript will be designated as "Tr. __."

1

## Facts[2]

Sometime before November 4, 2017, Adam Loudermilk, a Game Warden[3] with the Law Enforcement Division of the Georgia Department of Natural Resources (DNR), spoke by phone with an anonymous caller who reported that someone was hunting on land that was baited for deer, i.e., that some sort of attractant had been scattered out to get the deer come closer to a hunter.  (Tr. 5-6, 46-47).  Ranger Loudermilk knows that Georgia law prohibits deer hunting within 200 yards of bait that has been placed or scattered or is within sight.  (Tr. 6-7).    The caller told Loudermilk that there was a hunting blind on the property with bait in front of the blind.  (Tr. 8).  A hunting blind is "a little popup tent" that allows someone to "sit inside and hunt without being detected by the wildlife."  (Tr. 8).  The caller also described the property where the blind was located, told Loudermilk "what road it was on, mostly wooded property.  That . . . the blind was located approximately a 100, 150 feet inside the woods from the road, and on the road there was like a telephone box."  (Tr. 8-9).  He also told Loudermilk that it was a gated area and he would have to get access to it.  (Tr. 9).  Loudermilk knew there was a private nudist

---

[2] These facts are taken from the hearing testimony of Adam Loudermilk, a Game Warden with the Georgia Department of Natural Resources, Law Enforcement Division, and from exhibits presented during the hearing (Docs. 26, 26-1 through Doc. 26-3 and Doc. 27).

[3] Game Wardens are "empowered to enforce any state law, but . . . generally concentrate on game and fish law, boating law, environmental law, and fishing laws."  (Tr. 5).

resort on the property at issue.  (Tr. 41, 48).  The caller gave Loudermilk a code to get inside the gate, but then he told Loudermilk he did not want him to use the code. (Tr. 9, 48).  Due to the difficulty getting to the area at issue, Loudermilk told the caller "that if he saw someone in the area hunting to let [Loudermilk] know and [he] would respond."  (Tr. 9-10).  Loudermilk did not know the caller; he "wished to remain anonymous."  (Tr. 7, 46).

After that conversation, Loudermilk researched information about the property, looked it up on the tax assessor's website, determined the property boundaries, and viewed an aerial photo of the property.  (Tr. 10).  Loudermilk already knew from experience that the caller's information about the gate being there was correct, and the aerial photo confirmed other information the caller had provided about directions to follow after going through the gate.  (Tr. 10-11).  Loudermilk also determined that Defendant owned the property within the resort where the tipster said the hunting blind was located, but his property did not extend to the resort's gate.  (Tr. 10, 45, 69).

The caller contacted Loudermilk again on November 4, 2017 and told him that he had observed a man "entering the woods with a firearm, rifle and camo, not wearing orange."  (Tr. 11, 48).  Loudermilk knew that if the man was hunting deer or bear without wearing orange, he would be violating Georgia law.  (Tr. 11-12). The tipster also stated that it appeared that the man had been drinking that day, which

could also be a violation of state law if the man was also hunting and posed a safety issue. (Tr. 12-13, 48). Loudermilk decided to respond to the area to verify whether someone was illegally hunting, and he asked a Georgia state patrol trooper to go with him as backup for safety reasons. (Tr. 13, 16). Loudermilk testified that O.C.G.A. § 27-1-20 authorizes DNR game wardens to enter private property, whether it is posted or not, in the performance of their duties without having to obtain a search warrant or authorization from a judge, so he did not obtain a search warrant or authorization from a judge before going to the property. (Tr. 16).

When Loudermilk and the trooper arrived at the property shortly after 11:45 a.m., there was a man sitting at the gate who asked if they "needed in," and Loudermilk responded "yes." (Tr. 13-14, 19, 47, 65). Loudermilk was wearing his uniform with embroidered name badge and orange vest which also had a badge on it, and the trooper was wearing his uniform with a bright yellow vest that said "state trooper" on it. (Tr. 28). The man then used his code and opened the gate.[4] (Tr. 14, 65). There is a sign on the fence near the gate stating "Private Property" and a sign identifying the resort as "Bare Bell Acres Resort." (Def. Ex. 1 (Doc. 26)). Once inside the gate there is a sign which states "all visitors and vehicles must be registered in office." (Tr. 43; Def. Ex. 3 (Doc. 26-2)). The tipster told Loudermilk

---

[4] Loudermilk now believes it is likely that the man at the gate was the complainant, but he is not certain. (Tr. 65).

which road to follow once inside the gate and how to get to that road, and he gave Loudermilk the address for a mobile home (also referred to as a camper) and told him to go past the mobile home to a telephone box sitting on the side of the road, then enter the woods at the telephone box.  (Tr. 14, 49).  The caller also said that Defendant drove a small truck.  (Tr. 22).  Loudermilk followed the caller's directions and saw the mobile home, a small truck, and the telephone box, thereby verifying that the tipster had given him accurate information about where to go inside the gated area to get to the hunting blind.  (Tr. 14-15, 22).  Loudermilk also knew that he then was on Defendant's property based on the tax assessor's website, aerial photographs, and maps he had reviewed.  (Tr. 15, 45).  There is a sign on a tree near the driveway to Defendant's mobile home that says, "Posted, Private Property."  (Tr. 44-45; Def. Ex. 4 (Doc. 26-3)).

Loudermilk parked next to the telephone box and walked further into the property, but he was not able to see very far due to thick underbrush.  (Tr. 16-17).  After he had gone 100 to 200 feet, Loudermilk saw a hunting blind in front of him to the right about 30 to 40 feet away from him.  (Tr. 17, 50).  He began walking toward the blind and activated his body camera.  (Tr. 18, 20-21; Gov't Ex. 1 (Doc. 27)).  Loudermilk called out to identify himself and saw "something red or orange through the window of the blind," so he initially thought someone was inside the blind and announced his presence and identified himself.  (Tr. 21).  As he got closer he realized

5

no one was in the blind but he saw a chair inside and an empty alcoholic beverage container, and in front of the blind was scattered corn, indicating that the area was baited in violation of Georgia law. (Tr. 21). The observation of the container raised his "curiosity . . . as to whether or not there was someone there somewhere hunting under the influence." (Tr. 21-22). Once Loudermilk saw that no one was inside the blind he turned off his body camera. (Tr. 22).

He told the trooper that they would "walk up to the camper and knock on the door and try to speak with whoever was there in regards to some of the possible violations [of] the laws and regulations pertaining to hunting." (Tr. 23). He also called the tipster back and told him there was no one in the hunting blind. (Tr. 23). The tipster told Loudermilk he had seen a man go into the woods with camo and no orange on, carrying a firearm. (Tr. 23). Loudermilk and the trooper followed a worn path to Defendant's mobile home, where he observed a picnic table and six beer containers. (Tr. 24). He knocked on the door, but no one answered. (Tr. 24). While he was at the door, Loudermilk heard something in the woods to his right and then saw a man 20 to 30 yards away from him. (Tr. 24). The man—identified as Defendant—was in "full camo" and was not wearing orange and had something in his hands although Loudermilk could not see what it was. (Tr. 24-25, 52-53). As they made eye contact, Defendant kneeled down to the ground in what Loudermilk

6

believed was an attempt to hide from him.  (Tr. 24-26, 53).  Loudermilk identified himself and the trooper and began walking towards Defendant.  (Tr. 26).

Defendant began raising back up, and Loudermilk drew his weapon and ordered him to show his hands.  (Tr. 26, 54).  He also turned his body camera back on.  (Tr. 26).  Defendant slowly raised his hands up and began walking toward Loudermilk.  (Tr. 26).  Loudermilk told him to get down on the ground, and "after several times" of telling him to get on the ground, Defendant complied and got down on the ground on his knees.  (Tr. 26-27, 54-55).  Once Loudermilk could see that Defendant did not have anything in his hands, he lowered his weapon "to a low ready," went to Defendant, asked him where his gun was (which Defendant denied having), holstered his weapon, handcuffed Defendant for the safety of the officers and Defendant, and told him repeatedly that he was not under arrest.  (Tr. 27; Gov't Ex. 1).  Defendant was not then free to leave.  (Tr. 64).

Defendant was on his knees and Loudermilk identified the officers and asked Defendant why he had been hiding from him.  (Tr. 27, 56; Gov't Ex. 1).  Defendant repeatedly denied having a gun.  (Tr. 27-29).  While Loudermilk was talking with Defendant, the trooper got his attention and told him that there was a gun lying behind him on the ground.  (Tr. 29).  Loudermilk helped Defendant stand up and they walked to where the trooper was indicating.  (Tr. 29; Gov't Ex. 1).  Loudermilk retrieved the gun—a rifle—and asked Defendant if it was loaded.  (Tr. 29, 56; Gov't

7

Ex. 1).  Defendant responded that it was, so Loudermilk unloaded the gun for safety reasons.  (Tr. 29, 56).  Loudermilk repeated that Defendant was not under arrest but he needed to figure out what was going on, why he was "laying down in the woods." (Gov't Ex. 1).  Loudermilk then discussed whether Defendant was hunting, why he was hiding, and the gun.  (Gov't Ex. 1).  Defendant asked Loudermilk to uncuff him but Loudermilk indicated that he would "in just a second" because he was holding the gun they had found.  (Tr. 57; Gov't Ex. 1).

Once they got back to the mobile home area, Loudermilk asked Defendant to have a seat at the picnic table with his legs under the table, and he removed the handcuffs.  (Tr. 30, 57-58; Gov't Ex. 1).  Loudermilk also told Defendant a couple of times not to move.  (Tr. 58).  Defendant was not free to leave while Loudermilk investigated the possible hunting violations, including hunting without wearing orange, hunting over bait, and hunting under the influence.   (Tr. 30-31, 64). Loudermilk detected the odor of alcohol on Defendant and he wanted to do some field sobriety tests, so he went to his vehicle to obtain the field sobriety screening form while the trooper watched Defendant.  (Tr. 29-32, 58).  Defendant asked Loudermilk, "are you arresting me," and Loudermilk responded, "no, at this point I'm not arresting you." (Tr. 37; Gov't Ex. 1).  Loudermilk returned and administered several tests, during which Defendant exhibited signs of intoxication and asked him to take the Alco-Sensor test.  (Tr. 33-37, 60-63, 69-70).  Prior to administering those

tests Loudermilk again told Defendant he was not under arrest. (Gov't Ex. 1). Defendant blew into the Alco-Sensor, which measured positive for alcohol at .09, which is over the legal limit for hunting. (Tr. 38-39). If the Alco-Sensor indicates a positive result, the officer must have a state-administered blood or breath test performed at a hospital or jail. (Tr. 38-39). Loudermilk then placed Defendant under arrest for hunting under the influence and other hunting violations and secured the rifle in his truck to prevent it from being stolen or damaged. (Tr. 39-40). Loudermilk body cam video shows that Loudermilk placed Defendant under arrest 30 minutes after initially encountering Defendant. (Gov't Ex. 1). Loudermilk had not run Defendant's criminal history at that point and did not know that Defendant was a convicted felon. (Tr. 29, 39-40, 66). Loudermilk asked the trooper to transport Defendant to the Banks County jail because he was in a truck with no transport cage, and during transport he requested that dispatch run a criminal history. (Tr. 39). Loudermilk then learned that Defendant had a felony conviction. (Tr. 39-41, 67). At no point did anyone advise Defendant of his *Miranda* rights. (Tr. 67-68).

## Discussion

Defendant contends that any evidence seized from him must be suppressed because Ranger Loudermilk's warrantless entry into the private resort and entry onto Defendant's property violated the Fourth Amendment. (Doc. 32 at 5-10). Defendant also argues that any statements he made to Loudermilk should be suppressed as "the

9

product of an unconstitutional entry onto property upon which [Defendant] had a reasonable expectation of privacy" and because they were obtained while he was in custody but no *Miranda* warnings were given.  (*Id.* at 10-12).  The undersigned disagrees with each of Defendant's contentions and finds that suppression of the evidence and statements obtained on November 4, 2017 is not required.

## I.    <u>Initial Warrantless Entry Into Resort</u>

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ."  U.S. Const. amend. IV.  "The 'ultimate touchstone of the Fourth Amendment is reasonableness.' "  *United States v. Walker*, 799 F.3d 1361, 1363 (11th Cir. 2015) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)).

Defendant contends that the officers' initial entry through the resort gate onto resort property was unconstitutional because they did not have a warrant, and although he has not shown that he owns that part of the property, he contends that he "has communal ownership in the private resort community in which his property was located" and "had expressed a subjective expectation of privacy in the property as demonstrated by the erection of a fence, the presence of a lockout gate, and signage indicating the property as private."  (Doc. 32 at 5-10).  The Government argues that the initial entry onto the resort property did not implicate the Fourth

Amendment under the "open fields" doctrine, and even if the Fourth Amendment was implicated in the initial entry, the officers had consent of someone with apparent authority to allow them to enter the property. (Doc. 34 at 8-10, 16). The undersigned finds that the officers' initial entry onto the resort property was authorized by the apparent consent of the person who used his passcode to open the gate to the property and allowed them inside.

"[L]aw enforcement officers may search an individual's property without a warrant, as long as the individual voluntarily consents to the search." *United States v. Brumfield*, 352 Fed. Appx. 366, 367 (11th Cir. 2009) (unpublished decision) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219-22 (1973)). "Whether consent is voluntary is a fact question determined according to the totality of the circumstances," *Brumfield*, 352 Fed. Appx. at 367 (quotation omitted), and the government bears the burden of proving the existence and voluntariness of the consent. *United States v. Acosta*, 363 F.3d 1141, 1151 (11th Cir. 2004). Furthermore, "when the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171 (1974). The Court in *Matlock* explained that:

> Common authority is, of course, not to be implied from the mere
> property interest a third party has in the property.  The authority which
> justifies the third-party consent does not rest upon the law of property .
> . . but rests rather on mutual use of the property by persons generally
> having joint access or control for most purposes, so that it is reasonable
> to recognize that any of the co-inhabitants has the right to permit the
> inspection in his own right and that the others have assumed the risk
> that one of their number might permit the common area to be searched.

*Id.* at 171-72 n.7.

Moreover, "even if the consenting party does not, in fact, have the requisite relationship to the premises, there is no *Fourth Amendment* violation if an officer has an objectively reasonable, though mistaken, good-faith belief that . . . he has obtained valid consent to search the area." *United States v. Brazel*, 102 F.3d 1120, 1148 (11th Cir. 1997) (citing *Illinois v. Rodriguez*, 497 U.S. 177 (1990); *see also United States v. Fernandez*, 58 F.3d 593, 597 (11th Cir. 1995) ("The Supreme Court has held that a warrantless entry is valid when based upon the consent of a third party whom the police, at the time of entry, reasonably believed possessed common authority over the premises, even if the third party does not in fact possess such authority." (citing *Illinois v. Rodriguez*)).  Thus, for the consent to be proper, the Government must show that the consenting party had either actual or at least apparent authority to consent to the search and seizure. *See, e.g., United States v. Barnes*, 807 F. Supp. 2d 1154, 1178 (N.D. Ga. 2010) ("It is the Government's burden

to establish that Valda-Ceja had actual authority or apparent authority to consent to the searches.").

Here, when the officers—in uniform—approached the gate to the resort, a person at the gate asked if they needed in, and when they said they did, he then entered a gate code and allowed them into the resort. (Tr. 14, 65). Under those facts, the undersigned finds that the officers reasonably believed the person had common authority over the premises, even if that was not the case, and therefore at least apparent authority to allow them to enter. *See, e.g.*, *United States v. Diaz*, 279 Fed. Appx. 739, 741-42 (11th Cir. 2008) (finding that other tenants had at least apparent authority to consent to search of loading dock where they gave the agent a key to the loading dock and explaining that the fact that "the other businesses had keys to give Shull is inconsistent with the notion that One-Stop had an expectation of privacy in the dock"); *see also United States v. King*, 627 F.3d 641, 648 (7th Cir. 2010) (finding that restaurant cook had apparent authority to consent to search where he had keys to restaurant and code to deactivate the alarm). The undersigned also finds that the person voluntarily consented to their entry; there is no evidence that the officers demanded entry, threatened the person, or brandished their weapons. Accordingly, the undersigned finds that the officers' initial warrantless entry onto the resort property did not violate the Fourth Amendment.

## II.      **Entry Onto Defendant's Property**

13

A.    **Discovery Of Hunting Blind**

Once the officers were lawfully inside the resort property, they then proceeded onto Defendant's property, where they discovered the hunting blind about 100 to 200 feed from the road near Defendant's mobile home.  (Tr. 17, 50).  The undersigned finds that the Fourth Amendment is not implicated in the officers' actions at that point because the location of the hunting blind was not within the curtilage of Defendant's home.

"The private property immediately adjacent to a home is entitled to the same protection against unreasonable search and seizure as the home itself." *United States v. Taylor*, 458 F.3d 1201, 1206 (11th Cir. 2006) (citing *Oliver v. United States*, 466 U.S. 170, 180 (1984)).  "At common law, the curtilage is the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life, and therefore has been considered part of the home itself for Fourth Amendment purposes."  *Oliver*, 466 U.S. at 180 (internal quotation marks and citation omitted).  The curtilage is distinguished from "open fields," to which the "special protection accorded by the Fourth Amendment . . . is not extended. . . ." *Oliver*, 466 U.S. at 176, 180 (citing *Hester v. United States*, 265 U.S. 57, 59 (1924)).  A person "may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home." *Oliver*, 466 U.S. at 178.  "[T]he term 'open fields' may include any unoccupied or undeveloped area

14

outside of the curtilage." *Oliver*, 466 U.S. at 180 n.11.  Thus, "[a]n open field need

be neither 'open' nor a 'field' as those terms are used in common speech [and] [f]or

example . . . a thickly wooded area nonetheless may be an open field as that term is

used in construing the Fourth Amendment." *Id.*  Intrusion by the government into an

open field is not "a 'search' in the constitutional sense because that intrusion is a

trespass at common law." *Id.* at 183.

Whether an area is an open field or curtilage is a question of fact.  *United

States v. Berrong*, 712 F.2d 1370, 1374 (11th Cir. 1983).  "[A]lthough the private

property immediately adjacent to a home is treated as the home itself, this area is not

unlimited." *Taylor*, 458 F.3d at 1206 (citing *United States v. Dunn*, 480 U.S. 294,

300 (1987)).  Rather, "[i]t is limited to that property that the individual should

reasonably expect to be treated as the home itself." *Id.*  In *Dunn*, the Court

"identified four factors that assist us in resolving this question:

> (1) the proximity of the area claimed to be curtilage to the home; (2)
> the nature of the uses to which the area is put; (3) whether the area is
> included within an enclosure surrounding the home; and, (4) the steps
> the resident takes to protect the area from observation.

*Taylor*, 458 F.3d at 1206 (citing *Dunn*, 480 U.S. at 301).  These factors are not to be

applied mechanically, but "[r]ather, these factors are useful analytical tools only to

the degree that, in any given case, they bear upon the centrally relevant consideration

-- whether the area in question is so intimately tied to the home itself that it should

be placed under the home's 'umbrella' of Fourth Amendment protection." *Dunn*,

480 U.S. at 301.

Applying the *Dunn* factors to this case, the undersigned finds that the area where Loudermilk observed the hunting blind was not within the curtilage of Defendant's home, as it was not in an area Defendant "should reasonably expect to be treated as the home itself." *Taylor*, 458 F.3d at 1206. The area from which Loudermilk observed the hunting blind was at least 100 to 200 feet from the road near the driveway to Defendant's home, through a wooded area of thick growth and used for hunting, not the "intimate activity associated with the sanctity of a man's home and the privacies of life[.]" *Oliver*, 466 U.S. at 180.

Defendant argues, however, that the entire property within the resort, including the area where the hunting blind was located, was within the curtilage of his home by virtue of the fact that the resort was fenced and gated and intended to be private in light of its use as a nudist resort. (Doc. 32 at 7-9). The undersigned finds that argument to be without merit. The fact that the larger resort property was enclosed by a fence does not indicate that all of the property within the resort's boundary constituted the curtilage of Defendant's home. *See Taylor*, 458 F.3d at 1208 ("A perimeter fence around property does not create a constitutionally protected interest in all the open fields on the property."). Here, there is no evidence that the hunting blind was located in an enclosure surrounding Defendant's camper such that it could even arguably be described as within the curtilage.

16

Accordingly, the undersigned finds that the officers' discovery of the hunting blind did not violate the Fourth Amendment because it occurred beyond the curtilage of Defendant's home.

### B.   Approach To Defendant's Camper

The record shows that after discovering the hunting blind the officers approached Defendant's home to question its occupants about the possible violations of the hunting laws.  (Tr. 23).  "Officers have an 'implicit license' to enter onto a person's property to knock and speak with the occupant, as 'any private citizen might do.' "  *United States v. King*, No. 15-12076, 2015 U.S. App. LEXIS 22796, at *3 (11th Cir. Dec. 30, 2015) (unpublished decision) (quoting *Florida v. Jardines*, 569 U.S. 1, 8 (2013)).  Even if the officers make 'a minor departure from the front door' in an effort to speak with the occupant of a home, they do not exceed the scope of the 'knock and talk' exception."  *Id.* (quoting *United States v. Taylor*, 458 F.3d 1201, 1203-05 (11th Cir. 2006)).  "The fundamental basis of the 'knock and talk' exception is that officers may enter onto a person's property to try to find someone to whom they can ask questions."  *Id.*  The undersigned finds that the officers did not violate the Fourth Amendment by approaching Defendant's home to conduct a "knock and talk" and question its occupants about hunting violations.

## II.   Detention Of Defendant And Seizure Of Gun

While conducting the "knock and talk," Loudermilk observed Defendant coming from the woods towards his residence. (Tr. 24-25, 52-53). He observed that Defendant was wearing camo but no orange, that he was holding something, and then kneeled down in what appeared to be an attempt to hide from Loudermilk. (*Id.*). Defendant began standing back up, raised his hands up pursuant to Loudermilk's directions, and then began walking toward Loudermilk. (Tr. 26, 54). When he put his hands up, they were empty (Tr. 26-27), thus indicating that he had dropped or hidden whatever he had been holding earlier. Loudermilk then took steps to secure and detain Defendant while he investigated his suspicions that Defendant had violated hunting laws, including hunting while intoxicated, hunting deer with bait, and hunting while not wearing orange.

"[T]he Fourth Amendment does not prohibit a police officer, 'in appropriate circumstances and in an appropriate manner [from] approach[ing] a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest[.]' " *United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011) (quoting *Terry v. Ohio*, 392 U.S. 1, 22 (1968)). "That is, law enforcement officers may seize a suspect for a brief investigatory *Terry* stop where (1) the officers have a reasonable suspicion that the suspect was involved in, or is about to be involved in, criminal activity, and (2) the stop 'was reasonably related in scope to the circumstances which justified the interference in the first place.' " *Id.*

18

(quoting *Terry*, 392 U.S. at 19-20, 30).  In evaluating the reasonableness of an investigatory stop, courts consider the "totality of the circumstances," and "[t]here are several issues relevant to this analysis, 'including the law enforcement purposes served by the detention, the diligence with which the police pursue the investigation, the scope and intrusiveness of the detention, and the duration of the detention.' " *United States v. Gil*, 204 F.3d 1347, 1351 (11th Cir. 2000).

The undersigned has considered those factors in light of the facts and circumstances described at the hearing and finds that Defendant's investigatory detention was reasonable and did not impermissibly ripen into an arrest without probable cause in violation of the Fourth Amendment.  Loudermilk had information from a tipster that a person was hunting deer on that property using bait, hunting while not wearing orange, and possibly hunting while intoxicated, in violation of Georgia law.  As he traveled through the property Loudermilk's observations confirmed the information he obtained from the tipster about the directions to follow and the structures on the property.  He found a hunting blind with bait in front of it as well as evidence that the person who was using the hunting blind had been drinking, and he also saw evidence of alcohol use at Defendant's camper.  When he saw Defendant, Defendant was coming out of the woods wearing camo but no orange and holding something in his hands which he then appeared to have put down.  These circumstances gave rise to a reasonable suspicion that Defendant had violated

19

the hunting laws, and Loudermilk reasonably detained him in order to investigate those violations.

Loudermilk also acted diligently in investigating the violations by asking Defendant about having a gun, whether he had been hunting, and whether he had been drinking. It was while he questioned Defendant that the trooper spotted the rifle, further increasing Loudermilk's suspicions. Loudermilk also detected the odor of alcohol and therefore subjected Defendant to field sobriety tests to determine if he was intoxicated. These were all reasonable investigative steps taken in furtherance of the purpose for the initial detention of Defendant, i.e., to investigate suspected violations of the hunting laws. Moreover, the video of the detention (Gov't Ex. 1). shows that it lasted approximately 30 minutes from the time the officers first encountered Defendant until Loudermilk placed him under arrest, which is not an unreasonable length of time. *See, e.g.*, *United States v. Lester*, 477 Fed. Appx. 697, 701 (11th Cir. 2012) (finding that 30 to 40 minute detention was reasonable and did not exceed the scope of detention allowed under *Terry*); *Gil*, 204 F.3d 1350-51 (finding that 75-minute investigative detention during which the defendant was handcuffed in a police car was not unreasonable where the agents "detained [her] for only as long as it was necessary to complete their investigation of the residence," and handcuffing and detaining her in the police car was reasonable

in order to "maintain the safety of the officer and the ongoing investigation of the residence").

Moreover, Loudermilk took reasonable steps to protect the safety of himself, the trooper, and Defendant when he handcuffed him. Loudermilk was there to investigate illegal hunting, and therefore there was a possibility that Defendant had a weapon; it appeared that Defendant took steps to hide himself, or the object he was holding, when he saw Loudermilk; and he began approaching Loudermilk and was slow to comply with Loudermilk's directives to get on the ground. *See, e.g.*, *United States v. Hastamorir*, 881 F.2d 1551, 1557 (11th Cir. 1989) ("The handcuffing of Hastamorir constituted a *Terry* stop, and was a reasonable action designed to provide for the safety of the agents."); *United States v. Kapperman*, 764 F.2d 786, 790 n.4 (1985) (explaining that handcuffing or restraining a detainee does not automatically convert a *Terry* investigative detention into an arrest, and "[p]olice may take reasonable action, based upon the circumstances, to protect themselves during these encounters, or to maintain the status quo").

The undersigned finds that Ranger Loudermilk diligently pursued methods designed to investigate Defendant's suspected violations of Georgia's hunting laws. The scope, intrusiveness, and duration of the detention were reasonable in light of the purposes served by the detention and the evolving circumstances which heightened Loudermilk's suspicions as the encounter with Defendant continued, i.e.,

21

"[e]ach investigatory act logically led to the next act which was done without delay." *United States v. Acosta*, 363 F.3d 1141, 1146 (11th Cir. 2004). Thus, the investigatory detention was reasonable and did not impermissibly ripen into an arrest without probable cause in violation of the Fourth Amendment.

The undersigned also finds that Loudermilk's seizure of the rifle was reasonable and did not violate the Fourth Amendment. The gun was in plain view and therefore its discovery and seizure did not violate the Fourth Amendment. "The 'plain view' doctrine permits a warrantless seizure where (1) an officer is lawfully located in the place from which the seized object could be plainly viewed and must have a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent." *United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir. 2006). As discussed above, the undersigned finds that the officers were lawfully located in the place where they observed the rifle, and its incriminating character was immediately apparent as they were investigating hunting violations and Defendant appeared to have dropped or hidden something in that area when he saw the officers. Moreover, the officers' seizure of the weapon was reasonable in order to secure the weapon for their own safety as well as to prevent the rifle from being stolen or damaged after Defendant was later taken into custody.

Because the officers did not violate Defendant's Fourth Amendment rights by entering the resort, going on to Defendant's property, detaining him, or seizing the

rifle, it is **RECOMMENDED** that Defendant's motion to suppress evidence (Doc. 17) be **DENIED**.

### III.   <u>Defendant's Statements</u>

Defendant argues that his statements should be suppressed as the product of the officers' initial illegal entry "onto property upon which [he] had a reasonable expectation of privacy[.]"  (Doc. 32 at 10).  Because the undersigned finds that the officers did not violate Defendant's Fourth Amendment rights, it is also **RECOMMENDED** that Defendant's motion to suppress his statements on Fourth Amendment grounds be **DENIED**.

Defendant also argues that his statements should be suppressed because he was in custody when he made the statements, but the officers did not advise him of his *Miranda* rights before Deputy Delvalle questioned him.[5]  (Doc. 32 at 11-12). "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."  U.S. Const. amend. V.  In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that the Government "may not use statements, whether

---

[5] At the hearing the Government stated that it would not seek admission in its case-in-chief of any statements Defendant made after he was arrested and taken to the Banks County jail because he was not advised of his *Miranda* rights. (Tr. 73-74).  It is therefore **RECOMMENDED** that Defendant's motion to suppress those statements be **DENIED as moot** without prejudice to Defendant's right to seek suppression of those statements if the Government attempts to introduce them at trial.  The statements at issue in this Report are those statements Defendant made after he was handcuffed but before he was placed under arrest and transported to the Banks County jail.

exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  384 U.S. at 444.  Specifically, before a person in custody is interrogated, he must be advised that he has the right to remain silent; that anything he says can and will be used against him in court; that he has the right to consult with a lawyer and to have the lawyer with him during interrogation; and that if he cannot afford a lawyer, a lawyer will be appointed to represent him.  *Id*. at 467-73.  "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  *Id*. at 444.

It is well-settled, however, that "[p]re-custodial questioning does not require *Miranda* warnings."  *United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006) (original formatting altered) (citing *United States v. Brown*, 441 F.3d 1330, 1347-49 (11th Cir. 2006)).  "A defendant is in custody for the purposes of *Miranda* when there has been a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.' "  *Street*, 472 F.3d at 1309 (original formatting altered) (quoting *Brown*, 441 F.3d at 1347).  In *Street*, the Eleventh Circuit explained that the definition of "custody" for *Miranda* purposes is not the same as the definition of "seizure" for Fourth Amendment purposes:

> [A] seizure does not necessarily constitute custody for *Miranda* purposes.  The standards are different.  The Fourth

24

> Amendment seizure analysis uses the "free to leave" test: a person is "seized" when a reasonable person would not feel free to terminate the encounter with the police.  By contrast, a person is in "custody" for *Miranda* purposes only when there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

*Street*, 472 F.3d at 1309-10 (internal citations omitted) (quotation marks omitted); *see also United States v. Luna-Encinas*, 603 F.3d 876, 881 (11th Cir. 2010) ("We previously have explained, however, that although a reasonable person in the defendant's position may feel constrained not to leave the scene of a police encounter at a particular moment -- and thus may be deemed to have been 'seized' by law enforcement -- he will not necessarily be considered in 'custody' for Fifth Amendment purposes." (citing *Street*, 472 F.3d at 1310)).  The court in *Street* explained further that the test for whether a person is "in custody" is a "totality of the circumstances determination," and it is objective, as viewed from the perspective of "a reasonable innocent person."  472 F.3d at 1309.  Thus, "the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant."  *Id.* (quoting *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996)).

When applying this test, the court should consider several factors, "including whether 'the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled.' "  *Id.* (quoting *United States v. Long*, 866 F.2d 402, 405 (11th Cir. 1989)); *see also United*

*States v. Dix*, No. 3:12-cr-00007-TCB-RGV, 2013 U.S. Dist. LEXIS 22476, at *12

(N.D. Ga. Jan. 29, 2013) ("[F]actors relevant to this determination include, but are

not limited to, the location of the interview, the existence of any physical restraints

such as handcuffs or drawn weapons, whether the suspect asked to leave, the

officers' demeanor, the degree of pressure applied to the suspect, and whether the

officers brandished weapons, touched the suspect, or used language or a tone that

indicated that compliance with the officers could be compelled."), *adopted by* 2013

U.S. Dist. LEXIS 21902 (N.D. Ga. Feb. 19, 2013); *United States v. Johnson*, No.

2:12-cr-92-FtM-29DNF, 2013 U.S. Dist. LEXIS 108849, at *58 (M.D. Fla. Feb. 8,

2013) ("Some factors to consider include the location of the questioning, its duration,

the types of statements made during the questioning, the presence of physical

restraints, and the release of the suspect at the end of the questioning."), *adopted by*

2013 U.S. Dist. LEXIS 108850 (M.D. Fla. Aug. 2, 2013).   "No one fact is

determinative of the issue of whether the interview was custodial or not." *Id.* at *59.

"Unless restraint of an individual by law enforcement personnel is

'significant,' *Miranda* warnings are not required."   *United States v. Montos*, 421

F.2d 215, 222-23 (5th Cir. 1970).   Furthermore, it is the defendant's burden to

establish that he was in custody for purposes of *Miranda*.  *See United States v. Asher*,

No. 1:09-CR-414-JOB/AJB, 2010 U.S. Dist. LEXIS 112783, at *22-23 (N.D. Ga.

Feb. 25, 2010) ("[A] defendant bears the burden of establishing that he was in

custody and that his statements were made in response to government questioning."),
*adopted by* 2010 U.S. Dist. LEXIS 112823 (N.D. Ga. Oct. 21, 2010).

Here, it is undisputed that Defendant's statements were made in response to Loudermilk's questioning and that Defendant was not advised of his *Miranda* rights before he was questioned.  The issue turns on whether Defendant was in custody at that point, thus triggering the requirement that he be advised of his *Miranda* rights before questioning.  The undersigned finds that Defendant has not met his burden of establishing that he was in custody when Loudermilk questioned him.  Although Loudermilk initially pointed his weapon at Defendant and told him to put his hands up and then get on the ground, Loudermilk then he re-holstered his weapon before he placed Defendant in handcuffs.  (Tr. 26-27, 54-55; Gov't Ex. 1).  He also repeatedly told Defendant that he was not under arrest throughout the encounter. (*See* Gov't Ex. 1).  Other than his initial commands to Defendant, Loudermilk spoke with Defendant in a calm, conversational manner.  (*See* Gov't Ex. 1).  He also removed Defendant's handcuffs after they moved to Defendant's camper and sat at his picnic table, so that he was not handcuffed for the majority of the 30-minute detention.  (Tr. 30, 57-58; Gov't Ex. 1).  These events occurred outside, on Defendant's property near his home.  *See Luna-Encinas*, 603 F.3d at 882 (noting that "Luna-Encinas was on familiar ground in his own front yard.  As we explained in Brown, we are much 'less likely to find the circumstances custodial when the

27

interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home.' " (quoting *United States v. Brown*, 441 F.3d 1330, 1348 (11th Cir. 2006)).

Although Defendant was not free to leave while Loudermilk investigated the suspected hunting violations, that fact does not prove that Defendant had been subjected to a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Street*, 472 F.3d at 1309. *See United States v. Acosta*, 363 F.3d 1141, 1147 (11th Cir. 2004) (explaining that "an investigatory stop does not necessarily ripen into an arrest because an officer draws his weapon, handcuffs a suspect, orders a suspect to lie face down on the ground, or secures a suspect in the back of a patrol car" (internal citations omitted)); *United States v. Blackman*, 66 F.3d 1572, 1576 (11th Cir. 1995) (stating that "the fact that police handcuff the person or draw their weapons does not, as a matter of course, transform an investigatory detention into an arrest").  It was not until after Loudermilk conducted the field sobriety tests and administered the Alco-Sensor test that he arrested Defendant and had him transported to the Banks County jail, at which time Defendant was in custody.  The undersigned therefore finds that Defendant has not proven that he was in custody for purposes of *Miranda* during his investigative detention.  *See, e.g.*, *United States v. Parker*, No. 1:10-CR-0176-JEC-JFK, 2010 U.S. Dist. LEXIS 133789, at *30 (N.D. Ga. Nov. 18, 2010) (finding that defendant was not in custody for purposes of *Miranda* where he was detained and handcuffed

during a drug investigation, where the detective told the defendant that "he was being detained, that is, that he was not under arrest," the detective had drawn his weapon but holstered it before questioning defendant, and the "detective's tone of voice was 'very laid back'; he did not yell; and he did not threaten Defendant"), *adopted by* 2010 U.S. Dist. LEXIS 133787 (N.D. Ga. Dec. 18, 2010).

In the alternative, if the district judge finds that Defendant was in custody when Loudermilk initially handcuffed him, the undersigned finds that suppression of Defendant's initial statements about the rifle is not required under the public safety exception to *Miranda*. "The public safety exception allows officers to question a suspect without first Mirandizing him when necessary to protect either themselves or the general public." *United States v. Newsome*, 475 F.3d 1221, 1224 (11th Cir. 2007). In *Newsome*, the court found that the public safety exception to *Miranda* applied to statements made by an arrestee about a gun in response to the question "Is there anything or anyone in the room that I should know about?" and follow-up questions "to pinpoint the exact location of the gun" after the officers had "ordered him to the ground and while he was being secured." *Id.* at 1225. The court found that "[t]he questioning officer took a simple safety measure to protect all officers present had a gun fight ensued," his "questions clearly were focused on securing the area and protecting the officers," and therefore the defendant's

statements "fall under the public safety exception to *Miranda* and were properly admitted at trial." *Id.*

In this case, Loudermilk asked Defendant if he had a gun (which he denied), both before and after he handcuffed him, and after the rifle was spotted and retrieved, Loudermilk asked Defendant if it was loaded, and Defendant responded that it was. (Tr. 27-29, 56; Gov't Ex. 1). Given Loudermilk's information that Defendant had been hunting, his observation that Defendant appeared to hide something he had been holding, his denials that he had a gun, and the discovery of a rifle in the area where Defendant had been, Loudermilk's questions about the gun were reasonably "focused on securing the area and protecting the officers." *Newsome*, 475 F.3d at 1225. Defendant's responses to Loudermilk's questions about the rifle, including whether it was loaded, therefore fall under the safety exception to *Miranda* and need not be suppressed.[6]

Accordingly, it is **RECOMMENDED** that Defendant's motion to suppress his statements (Doc. 15) be **DENIED**.

## Summary

---

[6] Although Defendant made other statements that were not about the gun, it is not clear that those statements are at issue or that the Government intends to introduce them as it confines its discussion of Defendant's statements in its brief to his statements about the rifle, in particular his statement that it was loaded. (*See* Doc. 34 at 28-32).

For the foregoing reasons, it is **RECOMMENDED** that Defendant's Motion To Suppress Statement (Doc. 15) and Motion To Suppress Evidence (Doc. 17) be **DENIED**.

**IT IS ORDERED** that, subject to a ruling by the District Judge on any objections to orders or recommendations of the undersigned Magistrate Judge, this case is **certified ready for trial.**

**IT IS SO ORDERED, REPORTED AND RECOMMENDED** this 26th day of October, 2018.

<u>/s/ J. Clay Fuller</u>
J. Clay Fuller
United States Magistrate Judge

31